**FORD MOTOR COMPANY and Douglas Stanley, Jr., d/b/a Doug Stanley Ford, Relators,**

v.

**Honorable Donald ROSS, Judge of the 4th Judicial District Court, Rusk County, Respondent.**

No. 12–94–00239–CV.

Court of Appeals of Texas, Tyler.

Oct. 25, 1994.

Mike Hatchell and Gregory D. Smith, Tyler, for relator.

Mark Mann, Henderson, R. Jack Ayers, Dallas, for respondents.

PER CURIAM.

## I. INTRODUCTION

This original mandamus proceeding arises out of a discovery dispute in a products liability suit. In the underlying lawsuit, the real parties in interest Susan Renae Miles (acting individually and as Next Friend of Willie Searcy and Jermaine Searcy) and Kenneth Miles ("Plaintiffs") sued Relators Ford Motor Company and Douglas Stanley, Jr. d/b/a Douglas Stanley Ford (hereinafter collectively "Ford"), for personal injuries that Willie Searcy suffered when the 1988 Ford Ranger pickup in which he was a passenger collided with another vehicle. As a result of the accident, young Searcy was rendered a ventilator-dependent quadriplegic. The accident occurred in April of 1993, and suit was filed on March 23, 1994.[1] Because of Willie Searcy's serious condition, Plaintiffs sought and Ford agreed to an expedited trial setting of October 31, 1994.

Since the filing of that suit, Ford has labored under the onus of a series of thorough, fast-paced pretrial orders. These pretrial orders, with few exceptions, uphold the numerous, comprehensive interrogatories and production requests propounded to Ford by Plaintiffs. If left intact, these orders will require Ford to produce, in all likelihood, millions of pages of documents.

At the outset, however, let us say that we are bound by the constraints of "abuse of discretion". While many equities lie with Ford, some of the legal footholds that would have entitled Ford to greater relief by mandamus, were lost amid the battle of the initial Rule 166b(4) hearing and later attempts to re-define an alternative, reasonable scope of discovery. Thus, for the most part we can only say that Respondent has committed an *unclear* abuse of his discretion; accordingly, we can only grant Ford a modicum of the relief it seeks without abusing ours.

## II. FACTUAL BACKGROUND OF THE DISCOVERY SUIT

### A. *THE JUNE 14TH HEARING ON PLAINTIFFS' FIRST MOTION TO COMPEL DISCOVERY AND FOR SANCTIONS AGAINST FORD MOTOR COMPANY: PRONOUNCEMENT OF THE THIRD PRETRIAL ORDER*

On April 4, 1994, Ford was served with process as well as Plaintiffs first set of inter-

---

1. Although Plaintiffs are Dallas County residents and the accident occurred in Dallas County, the suit was brought in Respondent's Court in Rusk County.

rogatories and production requests. On May 23, Ford responded to both the interrogatories and production requests by providing limited answers and asserting various objections. In production request numbers 2, 5,[2] 14 and 24, Ford asserted that some of the documents requested were privileged under the attorney-client and/or attorney work product-anticipation of litigation privileges. Ford, however, did not produce any documents within the time allowed under the discovery rules. Consequently, in a letter dated Friday, June 3, 1994, Plaintiffs complained to Ford about its responses and enclosed a draft of the motion to compel discovery that they were prepared to file if Ford did not cooperate. Ultimately, Plaintiffs filed their motion to compel discovery on Thursday, June 9, 1994 and obtained a Tuesday, June 14th, setting on the motion. Plaintiffs' 16–page motion to compel discovery was not addressed to Ford's responses over all, but sought relief from various objections Ford had lodged to specific discovery requests.

At the hearing on the motion to compel, Plaintiffs argued at length about Ford's history of discovery abuse in other cases, and its ability to ambush unwitting plaintiffs through its use of evasive discovery tactics. In response, Ford's New York counsel acknowledged to the court that "Plaintiffs are entitled to legitimate discovery, and that in a complex design case like this, that discovery will in fact be quite voluminous and massive." When Respondent asked Ford's counsel how long it would take Ford to produce the requested documents to Plaintiffs in Dallas, Ford's counsel responded:

> There are some documents that have arrived today and can be available for Plaintiffs today, a relatively small volume [approximately 7 boxes]. Others are in process and on the way. We're talking about days for that kind of material.

Counsel argued, however, that Plaintiffs had requested "hundreds of thousands of pages of test material", and those documents would be best produced at Ford's headquarters in Dearborn, Michigan. Ford's counsel further stated: "[I]f they have to be copied, that would be a substantial task and would require at a minimum—I believe it would require weeks." Ford's counsel explained to the trial court that gathering the documents was not a complex process, but it would take some time especially since the case was less than three months old. He further stated that Ford was going to honor its October trial date. Ford's counsel then explained in great detail how its Reading Room in Dearborn, Michigan worked. He explained that Ford had gone to great expense to create this central location for categorizing, logging and storing its discoverable documents, crash tests, reports, etc. Counsel further cited the court to several Texas cases where courts had approved Reading Rooms as an acceptable cite for the production of documents. Stating that on an average, litigants only had to spend two or three days in the Reading Room, counsel urged the Court to require Plaintiffs to use the Reading Room for discovery in this case too.

With regard to its privileged documents, Ford's counsel stated:

> We do have privileged documents that we're discussing in this case. We are prepared—not this minute, but we're prepared as early as tomorrow to provide a privileged log of documents that have not been included in test reports and in the test and study collection as we described it, but we believe that that issue has not really been joined. (emphasis added)

After completing his explanation of the Reading Room, and the reason for Ford's delay in production, Ford's counsel stated:

> We will do whatever is necessary to deal with the deadlines at issue, but I think it is important for me to note that a massive discovery such as Plaintiffs are demanding on this expedited basis is in fact part of what's causing the problem. I believe, Your Honor, our responses which have been given to you provides additional information about what we're doing, and I don't think it's necessary, unless you would

---

**2.** Since there is no dispute over request for production number 5, it will not be further discussed in this Court's opinion.

like it, to go into the individual details [here the Court agrees that it is not necessary] ... But we request that the motion be denied, at least in part, because we believe it is premature. We're prepared to provide material to Plaintiffs, we're prepared to work with them on immediate access to the reading room, and if they have problems after that, we're prepared to discuss with them, and if necessary, to deal with any motions they may bring. Thank you. [Emphasis added.]

It is undisputed that Ford offered no evidence in support of its objections to Plaintiffs' discovery.

At the conclusion of this hearing, Respondent granted Plaintiffs motion to compel, excluded from discovery anything that pertained to large trucks, buses or air bags, ordered Ford to answer fully and completely certain enumerated interrogatories [3] by June 27th), and ordered Ford to produce documents pertaining to certain production requests [4] by the end of the working day on July 5, 1994, at the offices of Plaintiffs' Dallas counsel. He further stated that "*[a]ny objections which Defendants have made to the Plaintiffs' discovery inconsistent with the Court's pronouncement are overruled.*" (emphasis added) The court made no ruling on Plaintiffs' request for sanctions.

Respondents pronouncements were subsequently memorialized on June 17th in the court's Third Pretrial Order. Ford now seeks relief from that order.

### B. FORD'S ATTEMPTS TO COMPLY WITH THE THIRD PRETRIAL ORDER

Subsequently, on June 21, 1994, counsel for the parties met in Dallas to discuss the scope of discovery. Although Ford believed that some inroads had been made on limiting scope, Plaintiffs refused to enter into Ford's proposed Rule 11 agreement. Thus, on July 1, 1994, Ford filed a motion to reconsider or modify the trial court's Third Pretrial Order, and Plaintiffs filed a motion for a protective order and for sanctions against Ford. On July 6th, the trial court heard Plaintiffs' mo-

tion; the parties reached an agreement on certain target dates for the completion of depositions, and the trial court carried the sanctions issue forward. On July 8th, Ford produced approximately 700,000 pages of documents. According to Ford, these documents were the ones that were responsive to Plaintiffs' requests based on its representations to Ford at their June 21st meeting. Ford represents that it took 149 people working over 6,400 hours to produce these documents at a cost to Ford of $355,000.

In addition to producing these documents, on July 8th Ford also supplemented its responses to Plaintiffs interrogatories and production requests with additional objections, *many of which asserted the attorney-client and work-product privileges for the first time.* On July 14th, Respondent conducted a hearing on this motion, a motion for protection, and a motion for extension. In lieu of entertaining these motions, the trial court appointed a special master to mediate the discovery disputes. At that hearing, Respondent stated: "The court is hopefully trying to get over what the court sees as an on going stalemate with regard to discovery, without placing blame on either side, and get past that so that we can try this case on its merits under the existing schedule." Thereafter, on July 15, 1994, Respondent signed an agreed order appointing Judge Paul S. Colley as Discovery Master "to oversee and report to this Court about discovery disputes and to attempt to settle any and all discovery disputes that arise between the parties and/or to report to this Court his suggestions and findings to assist this Court in making final rulings on discovery in this case."

### C. THE TWO HEARINGS BEFORE THE DISCOVERY MASTER AND ISSUANCE OF THE TWO MASTER'S REPORTS

### 1. THE JULY 27TH HEARING AND RESULTING REPORT:

At the outset of this informal hearing, the parties agreed that there would be no evidence offered; however, the parties disputed the issues they believed the discovery master

---

**3.** Interrogatory numbers 5, 6, 7, 8, 10, 11, 12, 13, 17, 18, 19, 20 and 21.

**4.** Production Request numbers 1, 2, 8, 9, 11, 14 through 25, 27 and 28.

was supposed to resolve. Plaintiffs argued that many of the 700,000 pages contained information that was "not relevant to the case at all, some that [was] redacted that should not [have been] redacted, some that [was] not readable and some that [was] duplicated." Plaintiffs also argued that the scope of the trial court's Third Pretrial Order did not need to be limited. According to Plaintiffs, only Ford was able to determine what was relevant to the lawsuit and what was not. They contended that no one would hold Ford in contempt for failure to produce irrelevant information. So, they argued, Ford needed to make a decision as to what was relevant and then it needed to stand behind that decision as being reasonable and supportable.

Ford, on the other hand, argued that it did not need to produce anything further because Plaintiffs had already received everything they needed. When asked, however, whether Plaintiffs had received everything that was relevant under the Third Pretrial Order, Ford's counsel responded that it had already produced the complete tension-eliminator series of documents.[5] The master then stated that Ford's answer was not responsive to his question. To this, Ford's counsel replied that Ford has identified 104 tension eliminator lawsuits and that there might be documents in those suits that would be relevant to Plaintiffs' counsel.

With regard to privilege, Ford stated that it has given the master a complete copy of the unredacted information on the tension eliminator, and that it did produce to him a portion of the tension eliminator collection that Ford viewed as privileged. The master then expressed concern about Ford's failure to produce unredacted copies of documents to Plaintiffs since the Third Pretrial Order overruled all of Ford's objections to discovery. Ford's counsel stated that the Third Pretrial Order made no reference to privilege. He further explained that, in Ford's view, because Plaintiffs' discovery requests were inappropriately over-broad and vague, Ford's duty to assert objections on the basis of privilege was never triggered. In support

of its argument, Ford counsel cited *Loftin v. Martin*, 776 S.W.2d 145 (Tex.1989). Additionally, Ford argued that Plaintiffs could not now complain that Ford had waived its privileges because Plaintiffs' motion to compel asserted many specific bases for complaint *but did not point out that Ford had failed to claim privilege and had thereby waived it.* According to Ford, it was Plaintiffs duty to *point out* that Ford had waived its privileges by failing to assert them.

Without reaching any decisions on the waiver of privilege or scope of discovery issues, Colley set a formal hearing date on the motion for protective order and motion to reconsider, and stated that he would review the documents presented to him for an in camera inspection and then notify the parties of his decision.

Subsequently, on August 2, 1994, The master issued his first report which recommended that certain of the documents submitted to him for in camera inspection be segregated out from discovery on the basis that they were privileged. This order is not challenged in Ford' mandamus petition.

### 2. THE AUGUST 22ND HEARING AND RESULTING REPORT:

At the commencement of this formal hearing, it was agreed that three issues were to be resolved: (1) obtain a ruling on the Plaintiffs' motion to have Ford produce certain expert documents that it had failed to produce under previous discovery requests; (2) obtain a ruling on Ford's motion to reconsider the trial court's Third Pretrial Order, and (3) obtain resolution of the issue of privilege presented by Ford Motor Company.

**a. Arguments on The Scope of Discovery:** In support of its motion to reconsider, Ford then tendered to the discovery master a notebook containing exhibits in the form of affidavits, supporting documents, deposition excerpts, case authorities, key correspondence and charts. By way of an opening statement, Ford's counsel stated that the

---

**5.** Ford vehemently contends that this lawsuit centers around a very narrow issue—the tension eliminator, which is a comfort device used to create slack in a seatbelt. Therefore, Ford ar-

gues that only documents pertaining to the tension eliminator are relevant, and that other factors such as seat construction are not at issue here.

parties had exchanged a series of letters in which Plaintiffs had ultimately designated 11 categories of documents that they wanted. Ford contended that the parties had reached substantial agreement on these issues except that Ford wanted assurances that its search for these documents could be limited to its Dearborn headquarters in order to relieve Ford of the responsibility to conduct a world-wide search. Ford then reported that since producing the initial 700,000 pages, it had produced an additional four boxes of documents along with other documents in small numbers. Ford then elaborated upon the back-breaking efforts it had undergone to comply with the trial court's order and concluded that it had demonstrated "good-faith", a requisite to any motion to reconsider. For the first time, Ford argued that at the June 14th hearing, Ford did not present any evidence because its witnesses' flight was canceled. However, Ford admitted that although there was an informal request for a continuance, no formal request for a continuance was made.[6] Ford further argued the trial court's order had caused Ford unnecessary burden and expense by requiring such broad production in a case that involved the narrow issue of the tension eliminator. Ford further argued that the court's Third Pretrial Order continued to impose a great burden on Ford in that it would still have to produce millions of more documents under the terms of the order. According to Ford, despite its good faith, it had only produced a fraction of the documents covered by Respondent's order. Ford claimed that unless the order were altered, it would be held in contempt and sanctioned, and these sanctions and penalties would inhibit its ability and willingness to continue with litigation. Following Ford's arguments, the master posed the following question:

THE MASTER: Do you have any estimate for me? You say you supplied over seven hundred thousand pages. What would follow? I mean have you got an estimate of how many pages would follow, if it were not narrowed?

FORD'S COUNSEL: We just know that it would be millions of documents and that's what, your honor, we're going to present evidence of. We've got some affidavits that talk about that, we have done it by breaking down all of the facilities that would have to be searched, we've done it by giving example of just one facility.

THE MASTER: That results from over-broad and irrelevant ... requests?

FORD'S COUNSEL: Yes. Well, its in the order, Your Honor, that is, its effects are.

THE MASTER: Let's just assume something here just a minute. Let's assume that Ford stumped their toe and failed to present evidence, failed to support their objections, and it would be tantamount to waiver, but irregardless [sic] of that, what you're saying in innate fairness, constitutional protection, that the Court is to step in and narrow the scope based on what these circumstances are now, because of the great amount of cost that Ford's going to be out.

FORD'S COUNSEL: What I'm saying, Your Honor, is that the Court has, under Code 21, Section 001, the authority, of course, to modify its orders and to do so when it's demonstrated that it's just to do so.

The master then stated that the court also had authority to modify discovery when what had been ordered would not benefit the plaintiff. Plaintiffs' counsel then interrupted asserting that "The fact is, is that we all agree it's a seat belt tension eliminator case at this point. I mean, that's what the Court needs to know. And so, I think we can agree with that." Ford's counsel then directed the master's attention to an exhibit which listed examples of irrelevant materials that Ford would be required to produce under the court's Third Pretrial Order.

After examining the chart of irrelevant information included under the Third Pretrial Order, the master stated that he had reviewed the discovery requests and the re-

---

6. The record from the June 14th contains neither a request for a continuance nor an explanation as to why no evidence was offered in support of Ford's objections to discovery.

sponses and: "There are some over-broad things. But no objection—that's the part that needs to be done over again." Plaintiffs' counsel, however, argued that some of the items on the chart that Ford had listed as irrelevant might actually be relevant to the case. These comments led Ford to present what it perceived as the heart of the stalemate: Plaintiffs wanted Ford to determine what documents were relevant to the litigation and produce only those; however, if Ford made such a determination, Plaintiffs might disagree and later argue that Ford has committed a discovery abuse by failing to produce a document which Ford classified as irrelevant but which Plaintiffs believe was relevant. At the conclusion of its argument, Ford referred the master to the affidavits of Mr. Hrynik, Mr. Gray and Mr. Mavis with regard to the future burden that would be imposed on Ford if the court's third pretrial order were upheld.[7] When the master asked Ford how it would propose to limit the order, Ford's counsel suggested:

Well, Your Honor, our proposal would be that what we do is have an order that is rewritten, a modified order that specifies the categories that are contained in the August 2nd letter by Mr. Mann, as modified by the August 17th letter by Mr. Grainger, with only additional limitations of that being that its, you know, the southeast Michigan Dearborn facilities, and that it's a you know, reasonable time period for that discovery and a reasonable model limitation.

Plaintiffs briefly rebutted this argument stating that regardless of what the order said, Ford ultimately had to make the decision as to what to produce because it was the only one that knew what was relevant to the tension eliminator case.

**b. Argument on Waiver or Preservation of Ford's Privilege Objections:** Citing to the dissent in *Loftin v. Martin, supra* Ford argued that it did not waive its right to assert privilege objections to Plaintiffs' discovery request by failing to object to discovery on that basis before the June 14th hearing or failing to introduce evidence of privilege at that hearing. Ford contended that because many of Plaintiffs' discovery requests were *inappropriate* (or should have been ruled as such at the June 14th hearing) under Rule 166b(2) its duty to assert its privileges was not triggered. It further contended that inappropriate requests included ones which were vague, ambiguous or overbroad. Ford's counsel then reminded the discovery master that Ford did object to Plaintiffs' production requests on grounds that they were over broad and sometimes used vague or ambiguous terms.

The problem, Ford argued, was that the scope of the requests was never narrowed by Respondent. According to Ford, only after the request was narrowed appropriately did Ford have a duty to come forward, plead privilege in a specific objection, and then if a request for hearing were made, prove up its privilege and submit the documents in camera to the court. Thus, Ford concluded, the trial court erred in failing to find that Plaintiffs' discovery requests were overly broad, and consequently Ford had no duty to assert its privileges. Ford cited several cases in support of its position, which will be considered below.

After hearing Ford's argument the master reached the heart of the motion to reconsider when he engaged Ford's counsel in the following colloquy:

THE MASTER: So the Court's going to be the one that makes the decision of what is appropriate or inappropriate, right?

FORD'S COUNSEL: That's true, yes.

THE MASTER: How do you give him the evidence which he can base that on?

FORD'S COUNSEL: Well, you present that at a hearing.

THE MASTER: You have to have an objection.

FORD'S COUNSEL: Right.

THE MASTER: You have to allege overbroad.

FORD'S COUNSEL: Right.

---

7. At certain points during Ford's argument, it's counsel offered documents from the notebook into evidence, and they were admitted subject to objections filed by Plaintiffs on many of Ford's affidavits.

THE MASTER: And you've got to prove it.

FORD'S COUNSEL: That's right.

THE MASTER: *And if you don't do either, and the request itself is not sufficient to satisfy him it's overbroad, and he overrules your objection, where are you?*

FORD'S COUNSEL: *Well, I guess the situation we have is, what if down the road in attempting to comply with that order, the party has produced hundreds of thousands of documents, maybe a million documents, maybe more, it's then determined, well, let's go back and determine whether really the scope of discovery is appropriate. We're back to the issue of was it appropriate discovery to begin with, such that the party's initial duty to plead and prove privilege was triggered?*

THE MASTER: *And actually you don't have, as a matter of right, you don't have a right to do that. You have to file a motion to reconsider, and that's in the Court's discretion, is it not? Not yours.*

FORD'S COUNSEL: *Well, I would think that that's true, but I think the Court probably is obligated in determining whether a person has waived privilege.*

Additionally, Ford's counsel argued that Plaintiffs' motion to compel was 16 pages long and discussed each interrogatory and request for production that they moved to compel, yet there was "[n]ot a peep about privilege objections in that motion."[8] Citing *National Union Fire Ins. v. Hoffman,* 746 S.W.2d 305, 310 (Tex.App.—Dallas 1988, no writ), Ford then argued that the fact that Ford offered to tender documents in camera to Respondent was enough to preserve the privilege objections it has raised before the hearing.[9] Plaintiffs counsel complained that

Ford's two-step theory required the court to conduct a hearing on a motion to compel before the responding party ever had to go out and look for any documents. He further argued that Ford's argument was inapplicable to privileged documents involving the tension eliminator series. Since Ford had been involved in tension eliminator cases before, at the time of the June 14th hearing, it had already segregated out those 7 boxes of production, and it already knew what documents would be privileged within that category of production. At the close of their argument, Plaintiffs stated that they wanted to put into evidence the affidavits of Randy Sandifer and Diane Reid, which were already in the file. The discovery master then took judicial notice of the court's file.

At the conclusion of the hearing, Ford's counsel stated that Ford would not object to an order that provided that Ford would not be able to admit at trial any documents other than those that it had produced in this case or that its experts produced to Plaintiffs; however, Ford stated that it wanted Plaintiffs to agree to do the same. Plaintiffs stated that they would not agree to show Ford any documents that they obtained from other sources that should have been produced by Ford itself. The hearing was concluded without the discovery master having made any recommendations from the bench.

In the master's second report, he overruled all objections made to the exhibits tendered by either side and he excepted from this report, his findings and recommendations in his first report as well as all documents that Ford had already produced. Thereafter, he concluded that Ford had waived all privilege objections set forth in its initial responses to Plaintiffs interrogatories and requests for production by failing to support its objections to requests for production with evidence and by failing to tender documents for an in camera inspection. He

---

8. In their May 23rd responses to discovery, Ford only raised privilege objections in production request number 2, 5, 14 and 24; request for production number 5 is not at issue in the instant mandamus proceeding.

9. At the close of this argument Master Colley informed the parties that whatever recommendation he ultimately made on the privilege issue would not affect his findings in his first report that certain of the documents Ford had previously submitted to him for in camera inspection were privileged, and as such, not subject to discovery.

further found that "[e]xcept for the objection that some of the requests and interrogatories were overly broad or ambiguous I have concluded that Ford has waived all of such objections as heretofore stated." The report then stated that some of the interrogatories and requests were overbroad or ambiguous, and he made recommendations for limiting the scope of each of those requests and interrogatories.[10] Finally, the report recommended that in the event Respondent prepared another order dealing with the Plaintiffs' interrogatories and production requests, the new order should "make clear to the parties that only documents, or other tangible things within the scope of discovery as fixed by the Texas Rules of Civil Procedure 166b(2) must be produced by Ford." Ford, thereafter, filed an objection to this report.

### D. THE SEPTEMBER 6TH HEARING:

#### PRONOUNCEMENT OF RESPONDENT'S SIXTH PRETRIAL ORDER

The portion of the September 6th proceeding in the record before us [11] commences with Respondent's hearing on Plaintiffs' third motion to compel and motion for sanctions. In hearing this motion, Respondent entertained a variety of Plaintiffs' complaints about Ford's failure to produce specific categories of documents. After hearing the parties arguments with regard to each complaint, Respondent entered an order sustaining the majority of Plaintiffs' complaints and ordered Ford to produce the documents and other items enumerated therein. Although we will not attempt to enumerate each of the rulings in that order, (appended hereto as "Appendix A") portions of paragraph 8 are of particular interest. Under paragraph 8, Respondent held Ford in contempt of his Third Pretrial Order and ordered it to produce the following:

8. Plaintiffs' Motion for Contempt and to Compel Production of Documents relat-

ing to similar claims and law suits against the Defendant Ford is GRANTED. The Court finds that the Defendant Ford Motor Company has in its possession documents relating to previous or pending claims or litigation arising out of the design, manufacture, sale or marketing of lap and/or shoulder belts which include a product feature variously described as "tension eliminator", "comfort feature" or "window shade" feature or devices. The Court finds that such documents are or may be relevant to the issues in this case or are reasonably calculated to lead to the discovery of relevant information. It is therefore ORDERED that the Defendant Ford Motor Company is in contempt of this Court's Third Pretrial Order. **Ford shall forthwith purge itself of such contempt by delivery of the following documents to Plaintiffs' counsel in the form and manner previously described:**

a. For each claim (not involving litigation) ... **copies of any records relating to the denial, resolution or settlement of the claim including any documents of release given or obtained for or on behalf of the Defendant Ford Motor Company.**

b. For all litigation:

.  .  .  .  .

**5. A copy of any documents reflecting the terms of any compromise, settlement or release obtained for or on behalf of Ford Motor Company.** (emphasis added)

Ford was required to produce this and other documentation by 5:00 p.m. on Thursday, September 8, 1994.

After specifically addressing Plaintiffs' long list of complaints, Respondent took judicial notice of the record from the discovery

---

**10.** The discovery master recommended limiting the scope of interrogatory numbers 6 and 11, and limiting the scope of request numbers 1, 2, 16, 17, 19, 23, 24, and 25. The limitations imposed included limiting these items to light trucks and passenger cars designed or manufactured during the years 1970–1993. Additionally, the term "occupant restraint" found in interrogatory no. 2

was limited to "occupant restraint protection", and request no.'s 8, 16 and 17 were clarified to refer to *active* restraints for occupant protection.

**11.** Only that portion of the hearing that transpired after recess was provided to this Court in conjunction with this mandamus proceeding.

master's hearing and exhibits filed therein. He then *briefly* entertained Ford's objections to the Discovery Master's second report, and promptly overruled Ford's objections and adopted both reports. Moreover, Respondent declined to further limit the scope of discovery.

On September 9, 1994, in addition to signing the Sixth Pretrial Order, Respondent also signed an order approving the discovery master's first and second reports. With the exception of the items listed in the discovery master's first report, this order required Ford to produce to Plaintiffs by 5:00 p.m. on Thursday, September 8th, all documents previously tendered to the discovery master for in camera inspection, and to produce all other documents by 5:00 p.m. on Friday, September 16, 1994.

### III. Commencement of the Mandamus Proceeding

On Monday, September 12, 1994, Ford filed the instant mandamus proceeding, a motion for emergency relief, and a motion respecting sealed documents. By way of its petition, Ford sought relief from Respondent's Third Pretrial Order, Sixth Pretrial Order and Order Approving First and Second Reports of Special Master and Compelling Production of Documents. Due to the voluminous record presented in conjunction with Ford's motion for leave to file its petition for writ of mandamus, and the narrow time constraints of the orders at issue, this Court promptly stayed further discovery without first granting Ford's motion for leave to file.[12] Thereafter, on September 23, 1994, having reviewed the record and reached the tentative opinion that Ford was entitled to mandamus relief, this Court granted Ford's motion for leave to file its petition for writ of mandamus and set oral arguments for October 5, 1994.

### IV. The Prerequisites for Issuance of a Writ of Mandamus

■ Mandamus is an extraordinary remedy, and it will lie only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no adequate remedy at law. *Walker v. Packer*, 827 S.W.2d 833, 841 (Tex.1992, orig. proceeding); *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985). While mandamus is a legal remedy, it is controlled by equitable principles. *Rivercenter Assoc. v. Rivera*, 858 S.W.2d 366, 367 (Tex.1993).

### A. NO ADEQUATE REMEDY BY APPEAL

■ For two reasons Ford has no adequate remedy by appeal. First, because of the herculean task of compliance with Respondent's orders, Ford argues that if no relief is granted, Ford either will be required to expend significant financial and physical resources in an attempt to comply with these onerous orders and avoid triggering Respondent's sanctions power, or alternatively, it will be forced into settlement to avoid sanctions and further expense. Appeal is not an adequate remedy if "the party's ability to present a viable claim or defense at trial is vitiated or severely compromised by the trial court's discovery order." *Walker*, at 843.

Second, if Ford is entitled to protect certain records from discovery under one of its asserted privileges, but no relief is granted before it is forced to produce them, appeal would not remedy the harm of Ford's forced disclosure. As was stated in *Walker*:

> [A] party will not have an adequate remedy by appeal when the appellate court would not be able to cure the trial court's discovery error. This occurs when the trial court erroneously orders the disclosure of privileged information which will materially affect the rights of the aggrieved party, such as documents covered by the attorney-client privilege.

*Walker v. Packer*, 827 S.W.2d at 843 *citing West v. Solito*, 563 S.W.2d 240 (Tex.1978). For these reasons, we conclude that Ford has no adequate remedy by appeal.

### B. ABUSE OF DISCRETION

■ Having found that Ford has no adequate remedy by appeal, we must next deter-

---

**12.** After unsuccessfully seeking to modify this Court's stay, Plaintiffs sought mandamus relief from this Court's order at the Texas Supreme Court. That court overruled Plaintiffs' motion for leave to file their Petition.

mine whether the trial court clearly abused its discretion by entering the instant orders. *See Walker,* 827 S.W.2d at 841; *Johnson,* 700 S.W.2d at 917. As explained by our supreme court, a court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Walker,* at 839–40. Having set forth the appropriate standard of review, we next examine each of the orders at issue in light of that standard.

### 1. THE THIRD PRETRIAL ORDER ISSUED JUNE 17TH

Respondent issued the Third Pretrial Order as a result of the June 14th hearing. The purpose of that hearing was to entertain Plaintiffs complaints concerning specific objections lodged by Ford in its May 23rd responses to Plaintiffs' requests for production and interrogatories. That hearing, as well as the discovery requests and responses that gave rise to it, were governed by TEX. R.CIV.P. 166b(4) which provides in relevant part:

> Either an objection or a motion for protective order made by a party to discovery shall preserve that objection without further support or action by the party *unless* the objection or motion is set for hearing and determined by the court. Any party may at any reasonable time request a hearing *on any objection* [note that "objection" is singular] or motion for protective order ... In objecting to an *appropriate discovery request within the scope of paragraph 2,* a party seeking to exclude any matter from discovery on the basis of any exemption or immunity from discovery, *must specifically plead the particular exemption or immunity from discovery* relied upon *and* at or prior to any hearing shall produce any evidence necessary to support such claim either in the form of affidavits served at least seven days before the hearing *or by testimony.* If the trial court determines that an in camera inspection and review by the court of some or all of the requested discovery is necessary, the objecting party must segregate and

produce the discovery to the court in a sealed wrapper or by answers made in camera to deposition questions, to be transcribed and sealed in event the objection is sustained. When a party seeks to exclude documents from discovery and the basis for objection is undue burden, unnecessary expense, harassment or annoyance, or invasion of personal, constitutional, or property rights, rather than a specific immunity or exemption, it is *not necessary* for the court to conduct an inspection and review of the particular discovery before ruling on the objection.[13] After the date on which answers are to be served, objections are waived unless an extension of time has been obtained by agreement or order of the court or good cause is shown for the failure to object within such period. (emphasis added).

**■ a. Ford's Initial Discovery Responses:** The first sentence of Rule 166b(4) requires that a party responding to discovery either make an objection or motion for protective order in order to preserve its objection to discovery requests. In responding to Plaintiffs' discovery, Ford chose to make certain objections. Except for request numbers 2, 24, and 14 where attorney-client and work product privileges were specifically asserted, and request number 17 where Ford alleged that "cost information" was proprietary, Ford generally objected on grounds that the requests were overly broad, unduly burdensome, oppressive, and sought documents that were neither relevant to the issues in the instant litigation nor reasonably calculated to lead to the discovery of admissible evidence. By asserting these objections, Ford preserved them without further action until put to its proof by Plaintiffs. Under the last sentence of Rule 166b(4), Ford waived any other objections unless it could establish "good cause" for failure to timely object.

**■ b. Plaintiffs' First Motion to Compel:** Rule 166b(4) provides that timely objections to discovery will suffice to preserve those objections "*unless* the objection

---

**13.** Note that while this sentence relieves the court of the duty to conducting an in camera inspection of documents or discovery for these types of objections, it does not relieve the court of the duty to receive evidence in support of these types of objections.

... is set for hearing and determined by the court. Any party may at any reasonable time request a hearing *on any objection* or motion for protective order." (emphasis added). Once a responding party has asserted a privilege or other objection to discovery, the burden of requesting a hearing on those objections rests with the party seeking discovery. *McKinney v. National Union Fire Ins. Co.,* 772 S.W.2d 72, 75 (Tex.1989).

Here, the thrust of Plaintiffs' motion to compel was that Ford was improperly attempting to "rewrite the discovery requests of Plaintiffs and thereby to unilaterally and improperly limit the scope of this litigation." Plaintiffs complained that Ford was limiting its production to the right, front outboard seatbelt in 1988 Ford Ranger trucks. Rather than request a hearing on all of Ford's asserted objections, Plaintiffs' 16–page motion targeted a number of Ford's specific objections. However, its only attack on Ford's assertions of privilege fell on Ford's response to request number 17.[14] Thus, Ford's assertion of attorney-client and/or attorney work product privileges in its responses to request numbers 2, 14, and 24 were not placed in issue by Plaintiffs' first motion to compel.

**c. The June 14th Hearing:** At this hearing, Ford introduced no evidence in support of any of its objections. Furthermore, its argument did not specifically address the various interrogatories and requests that it had asserted were overly broad. Instead, it made a plea for more time, and requested that Respondent allow production to take place at its Reading Room in Dearborn, Michigan. Additionally, it offered to provide the court with a log of privileged documents for its in camera inspection the next day. In making this offer, however, Ford emphasized that it did not believe its privileges had been joined as an issue in the hearing.

At this hearing, Ford did not make clear to the court the extent of the burden Plaintiffs' discovery was imposing on Ford. When Respondent asked Ford's counsel how long it would take Ford to produce the requested documents to Plaintiffs in Dallas, Ford's counsel responded:

There are some documents that have arrived today and can be available for Plaintiffs today, a relatively small volume [approximately 7 boxes]. Others are in process and on the way. We're talking about days for that kind of material.

Counsel argued, however, that Plaintiffs had requested "hundreds of thousands of pages of test material". "[I]f they have to be copied, that would be a substantial task and would require at a minimum—I believe it would require weeks." Ford's counsel informed the court that gathering the documents was not a complex process, but it would take some time.

■■■ **d. Analysis:** A trial court abuses its discretion if it *denies* discovery when no evidence has been presented in support of the responding party's objection. *Weisel Enterprises, Inc. v. Curry,* 718 S.W.2d 56, 58 (Tex.1986, orig. proceeding); *Hyundai Motor America v. O'Neill,* 839 S.W.2d 474 (Tex. App.—Dallas 1992, orig. proceeding). Because Ford presented no evidence in support of its objections, the trial court would have abused its discretion had it sustained Ford' objections for which evidence was required:

(1) **Overbreadth Objections:** In most cases, courts have required some evidence of overbreadth. *See Miller v. O'Neil,* 775 S.W.2d 56 at 59 (Tex.App.—Houston [1st Dist.] 1989) (stating "No evidence was presented showing that the request was overbroad as to the period from 1979 to 1987."); *Mole v. Millard,* 762 S.W.2d 251 (Tex.App.—Houston [1st Dist.] 1988) (holding that no evidence in support of the "overbreadth" claim was introduced at the hearing, and the requests were not overbroad); *Also see Chamberlain v. Cherry,* 818 S.W.2d 201, 205 (Tex.App.—Amarillo 1991, orig. proceeding); *But See Loftin v. Martin,* 776 S.W.2d 145, 148 (Tex.1989, orig. proceeding). In *Loftin,* the plaintiff's request for production essentially sought production of the responding party's entire claims file. When this was pointed out to the trial court at a hearing that plaintiff did not attend, the court found that the request was overly broad even without the

---

14. In that response Ford has stated that the "cost

information" sought was proprietary in nature.

introduction of any evidence. In the instant case, none of Plaintiffs' requests can be construed to be as broad as the request in *Loftin*. Thus, Ford should have presented some evidence or at least some direct argument of overbreadth on each discovery request or interrogatory where it asserted that objection.

(2) **Undue burden:** Likewise, Ford's objections on grounds of undue burden required some evidence. As was stated by Justice Keltner, "[a]ny party who seeks to exclude matters from discovery on grounds that the requested information is unduly burdensome, costly or harassing to produce, has the affirmative duty to plead and prove the work necessary to comply with discovery." *Independent Insulating Glass/Southwest v. Street*, 722 S.W.2d 798, 802 (Tex.App.—Fort Worth 1987, writ dism'd w.o.j.) (orig proceeding); *Chamberlain v. Cherry*, 818 S.W.2d 201.

(3) **Relevance:** Although objections on grounds of relevance need not always be supported by evidence, *See Valley Forge Insurance Co. v. Jones*, 733 S.W.2d 319, 321 (Tex.App.—Texarkana 1987, orig. proceeding), in the instant case, Ford, at the very least, should have directed the court's attention to such objections and advocated their validity.

Given Ford's generalized arguments at the hearing, we cannot say that Respondent abused his discretion in failing to sustain any of Ford's objections placed in issue by Plaintiffs' first motion to compel. However, to the extent Respondent's Third Pretrial Order indirectly overruled Ford's privilege objections asserted in its responses to request for production numbers 2, 14, and 24, we conclude that Respondent abused his discretion.

2. *Order Approving First and Second Reports of Special Master and Compelling Production of Documents*

With regard to this Order, Ford complains that Respondent abused his discretion in

adopting the discovery master's second report. That report essentially did two things: (1) It held that Ford had waived its right to assert any privileges; and (2) It imposed some additional limitations on the scope of discovery.

### a. Did Ford Waive its Privileges?

■ As stated above, on May 23rd, Ford filed its initial responses to Plaintiffs' discovery requests. In those responses, Ford asserted objections on the basis of the attorney-client and/or attorney work product/anticipation of litigation privileges in responses to requests 2, 14, and 24. Additionally, on July 8, 1994, Ford filed its supplemental response to Plaintiffs' first request for production of documents. In that response, it asserted for the first time that information sought in request numbers 1, 3, 5, 15, 18, and 19 was privileged under certain specified privileges.

On July 15, all further discovery disputes were referred to a discovery master.[15] At the August 22nd hearing before the discovery master, Ford argued that many of its materials were protected from discovery on the basis of privilege. It argued that because many of Plaintiffs' discovery requests were overly broad, they were thus inappropriate and Ford had not had a duty to assert its privilege objections to them. Ford now makes this "appropriate request" argument to this Court. In support of its position, it cites to the dissent in *Loftin v. Martin*, 776 S.W.2d 145 (Tex.1989), and *El Paso Housing Authority v. Rodriguez–Yepez*, 828 S.W.2d 499 (Tex.App.—El Paso 1992, writ denied). Ford also cites two cases that it claims deal with an analogous provision on experts. Those cases are *Gutierrez v. Dallas Independent School Dist.*, 722 S.W.2d 530 (Tex. App.—Dallas 1986, rev'd on other grounds) and *Lacy v. Ticor Title Insurance*, 794

---

**15.** At the July hearing and before the issues of privilege and waiver were presented to the discovery master, Ford tendered certain documents to the master for in camera inspection. These documents were ones which Ford had withheld from the massive July 8th production on the premise that they were privileged, and thus, protected from discovery. Prior to ruling on the privilege issue, the master reviewed these documents, determined that some of them were protected from discovery, and made his recommendations on them in his first report. Those documents and that report are not at issue in this mandamus proceeding.

S.W.2d 781 (Tex.App.—Dallas 1990, writ denied).

Despite Ford's arguments and case authorities, the number of cases that hold there is a waiver where a responding party fails to timely and specifically plead and prove a privilege are legion.[16] Nonetheless, Ford's proposed exception to this general rule based on the "appropriate request" clause of Rule 166b(4) is not a new one. In fact, Ford's Dallas counsel presented this same argument to the Dallas Court of Appeals on behalf of Hyundai Motor America in a strikingly similar scenario. *See Hyundai Motor America v. O'Neill,* 839 S.W.2d 474 (Tex.App.—Dallas 1992, orig. proceeding). In that case, however, Hyundai objected to the plaintiffs' request for production no. 17 on the grounds that it was overly broad, *and it incorporated by reference,* its previously asserted objections of attorney work product and/or trade secrets. Hyundai's troubles arose, however, when it failed to produce evidence of its privilege objections at the initial hearing on the plaintiffs' motion to compel. After several other discovery hearings, Hyundai filed a mandamus proceeding in which it asserted that it had not had any duty to specifically plead and prove privilege at the initial hearing on the motion to compel since ultimately request no. 17 implicitly had been deemed overly broad, i.e. inappropriate.

Noting that under Rule 166b(4), "a party seeking to withhold documents from discovery must specifically plead the privilege or immunity relied on", and that a "litigant who fails to properly assert a privilege from discovery within the time allowed for a response ... waives the privilege or objection", the Dallas Court of Appeals stated that it had found no cases which supported Hyundai's argument and noted that Hyundai had cited none. *Hyundai,* at pp. 477–478. Nevertheless, because of facts that transpired after Hyundai's initial hearing on the motion to compel, the Dallas court found it unnecessary to directly address Hyundai's argument. Instead, it stated: "For purposes of this opinion, we assume *but do not decide* that Hyundai had no obligation to assert its claims of privilege in response to McDonald's initial request ... Nevertheless, we conclude that Hyundai waived its claims of privilege at subsequent proceedings before the special master." *Id.,* at p. 479.

The basis of the majority's finding of a subsequent waiver was: (1) Hyundai's admission in its response to re-written request no. 17 that *as reformed, request no. 17 was now appropriate* in scope, and (2) Hyundai's statements in its response that although it had found no documents that would satisfy plaintiffs request as interpreted by Hyundai it "asserts and reasserts its specific objections to producing any document protected from disclosure by the attorney-client privilege ... *in the event that any such protected document, otherwise responsive to the request, may be located or generated.*" (emphasis added). The majority of the panel held that even under Hyundai's "appropriate request" theory, it had admitted appropriateness yet had failed to specifically plead its privileges as required under *National Union Fire Insurance Co., v. Hoffman,* 746 S.W.2d 305, 307 n. 3 (Tex.App.—Dallas 1988, orig. proceeding) (holding that a conditional assertion of a privilege did not satisfy the specific pleading requirement of Rule 166b(4)). Consequently, we are left with little guidance on the issue other than that presented in the concurring and dissenting opinion. Similarly, the dissenting opinion in *Loftin* also addressed the issue of overbreadth objection in relation to a privilege objection.

Justice Kaplan, in his concurring and dissenting opinion in *Hyundai,* stated that he would have preferred to adopt Hyundai's two-step approach to pleading and proving privileges where the initial request was inappropriate. Kaplan noted that even the trial court recognized the merits of this approach when it stated: "there cannot be an obligation on the respondent to a discovery request to assert burdensomeness and also

---

16. *See Hobson v. Moore,* 734 S.W.2d 340, 341 (Tex.1987); *Peeples v. Honorable Fourth Supreme Judicial District,* 701 S.W.2d 635 (Tex.1985, orig. proceeding); *Kentucky Fried Chicken Nat'l Management Co. v. Tennant,* 782 S.W.2d 318, 320 (Tex.App.—Houston [1st Dist.] 1989, orig. proceeding); *Independent Insulating Glass/Southwest v. Street,* 722 S.W.2d 798, 802 (Tex.App.—Fort Worth 1987, orig. proceeding) and cases cited therein.

itemize and produce a log of all privileged documents which might be asserted ..."

With regard to the majority's conclusion that Hyundai had waived its privileges, the dissent further pointed out that *National Union Fire Ins. Co.* and other authorities relied upon by the majority were inapposite because those cases did not address the requirements for asserting a privilege to documents that "may be located or generated in the future." *Hyundai*, at p. 484. As pointed out by Justice Kaplan:

> While the duty to supplement is ongoing, the opportunity to assert objections is not. A party must plead any privilege or exemption to discovery within thirty days after the request is served. Otherwise, the privilege is waived ... Thus, the only effective way to preserve a claim of privilege for documents located or generated in the future is to object in the initial response ... It would be difficult, if not impossible, to plead privilege with any more specificity for documents that have not been located or do not yet exist. Similarly it would be impossible to prove a claim of privilege until any such documents are actually located or generated.

*Id.* Kaplan then agreed that Hyundai had waived its privileges as to any documents it had actually located at the time request no. 17 was re-written, but dissented as to "documents located or generated subsequent to the revised request." *Id.*, at pp. 483–84.

We agree with Justice Kaplan's analysis of Rule 166b(4) to the extent that it advocates relieving a responding party of the duty to

*unconditionally plead and prove the existence of specific privileges for documents which may be located or generated in the future.* Moreover, we agree with the dissent in *Hyundai* and *Loftin* [17] that in cases where an overbreadth objection has been timely lodged, Rule 166b(4) does not require that claimed privileges be elaborated upon or that the responding party be prepared to prove these privileges at an initial hearing on a motion to compel. However, we do hold that a responding party is required to timely assert privilege as one of its initial battery of objections. The first sentence in Rule 166b(4) mandates this: "Either an objection or a motion for protective order made by a party to discovery shall preserve that objection without further support or action by the party ..." RULE 166b(4). Moreover, this construction is most closely in accord with the dissenters' reasoning under the facts in *Hyundai* and *Loftin v. Martin.*[18] To hold that there is no duty to even assert a privilege objection until the responding party deems the scope of the request "appropriate" would likely foster prolonged discovery delays and trial by ambush, practices the Supreme Court has censured.[19] *See Gee v. Liberty Mutual Fire Insurance Co.*, 765 S.W.2d 394, 396 (Tex.1989); *Gutierrez v. Dallas Indep. School Dist.*, 729 S.W.2d 691, 693 (Tex.1987); *Garcia v. Peeples*, 734 S.W.2d 343, 347 (Tex.1987).

Applying this reasoning then to the instant case, we conclude that those initial privilege objections that Ford lodged in response to request numbers 2, 14 and 24 were

---

**17.** The majority decided the *Loftin* case on the basis that the trial court had upheld a privilege objection without first taking evidence or conducting an in camera inspection of the allegedly privileged documents. It did not address the fact that the objecting party had also asserted an objection to discovery on the basis that the request was overly broad. The dissent written by J. Hecht, joined by Phillips, Gonzalez, and Cook, opined that the trial court had sustained the particular objection to the request on the basis that the request was patently overbroad and that the privilege objection had not even been addressed by the trial court.

**18.** Importantly, in both of these cases, the responding parties had timely raised *both overbreadth and privilege objections*, but had either

not plead them with sufficient specificity or tendered evidence of their legitimacy.

**19.** Under Ford's argument, all the responding party would have to do is allege overbreadth, then wait until it felt the scope had been appropriately narrowed. Privileges could then be asserted at the eleventh hour. Although Ford relies upon the *Rodriguez–Yepez* case where the resisting party was not required to assert any exemption or privilege due to the nature of the interrogatory, that case is readily distinguishable on its facts. There, the propounding party requested information from the responding party, which was not merely over-broad or ambiguous, but was clearly outside the scope of permissible discovery under 166b(2).

preserved under Rule 166b(4). Moreover, since they have not been challenged by plaintiffs in a motion to compel, Ford has not yet been required to present evidence in support of them. However, those privilege objections that Ford asserted for the first time in its supplemental response to discovery of July 8th, i.e. *responses to request numbers 1, 3, 5, 15, 18, and 19* were waived for failure to timely assert them. Thus, to the extent that Respondent adopted the master's report waiving the privileges asserted in Ford's responses to request number 2, 14 and 24, he committed an abuse of discretion.

**b. The Scope of Discovery:** As recently reiterated by the Waco Court of Appeals: "The permissible scope of discovery includes anything reasonably calculated to lead to the discovery of material evidence,' but overly broad requests, harassment, or disclosure of privileged information exceed that scope." *Easter v. McDonald,* 877 S.W.2d 77 (Tex. App.—Waco 1994, orig. proceeding) *citing Jampole v. Touchy,* 673 S.W.2d 569, 573 (Tex.1984) (orig. proceeding). However, the broad scope of discovery into any non-privileged matter relevant or reasonably calculated to lead to the discovery of admissible evidence is tempered by the opposing party's interest in avoiding overly broad requests, harassment or disclosure of privileged information. *Housing Authority of City of El Paso v. Rodriguez–Yepez,* 843 S.W.2d 475 (Tex.1992); *Axelson, Inc. v. McIlhany,* 798 S.W.2d 550 (Tex.1990). The trial court's authority to control or prevent discovery is not absolute; it must be exercised in conjunction with the discovery rules and with due regard for the rights and expectations of the parties regarding continued discovery. *General Elec. Co. v. Salinas,* 861 S.W.2d 20, (Tex. App.—Corpus Christi 1993, no writ). When a discovery order forces production of patently irrelevant information that imposes a burden on the resisting party, which is far out of proportion to any benefit the requesting party might acquire, mandamus has been used to alleviate the burden on the resisting

party. *Kern v. Gleason,* 840 S.W.2d 730 (Tex.App.—Amarillo 1992, orig. proceeding).

In the instant case, the record from the June 14th hearing undoubtedly demonstrates that Ford failed to establish the merits of its discovery objections challenged by Plaintiffs in their first motion to compel. Afterwards, however, several things occurred that merited Respondent's further consideration of the scope of discovery: (1) Ford's initial attempt at compliance with the Third Pretrial Order yielded the production of over 700,000 pages of documents and hundreds of taped crash tests; (2) after production of the initial 700,000 pages of information, Plaintiffs conceded that the instant litigation was a tension eliminator case [20]; (3) at the August 22nd hearing before the discovery master, Ford introduced numerous affidavits from Ford employees, which elaborated upon the monumental burden the discovery order had placed on Ford, and the extent of the future burden in terms of time constraints, human resources and expense; (4) Ford introduced into evidence the affidavit of David Thompson, an attorney with Ford's discovery group; Thompson's affidavit specified the undue burden and overbreadth of each interrogatory and request complained of; (5) Ford also introduced into evidence a chart that enumerated specific types of materials it was being required to produce even though they were not relevant in a tension eliminator suit; [21] (6) at the July 27th hearing, Plaintiffs made the following argument with regard to Respondent's third pretrial order:

> "Judge Ross' order does not order that they produce irrelevant documents ... they're [Ford] the ones that have to make that decision. And what they want the Court to do is to try to somehow make a decision of what is relevant and what's not when there is no way the Court can do that, *because nobody knows what Ford has in their possession. They've got to make that decision and stand by their decision*

---

**20.** At p. 44 of the statement of facts from the August 22nd hearing, Plaintiffs counsel states: "The fact is, is that we all agree its a seat belt tension eliminator case at this point. I mean that's what the court needs to know."

**21.** See "Appendix B".

*as being a reasonable decision that's supportable.* (emphasis added)

(7) at the August 22nd hearing before the discovery master, Plaintiffs made the following similar argument: "Defendants basically said that the Court's third pretrial order is so all-inclusive and broad that it requires them to produce things that are irrelevant. We don't agree. *We think the Court's third pretrial order requires them to produce things that are relevant to the litigation.*" (emphasis added); and (8) by correspondence dated August 2, 1994, Plaintiffs identified 11 categories of information that they felt were relevant to the litigation.[22]

The trial court thereafter took judicial notice of the record from the two hearings before the special master, and the evidence introduced at those hearings. After entertaining only brief arguments, Respondent overruled Ford's objections to the discovery master's second report and adopted the report.

It is only natural where the initial scope of discovery is extremely broad, that as the case develops, the issues will become more narrowly defined. Weighing the eight factors enumerated above against any modest benefit Plaintiffs might gain from the production of millions of pages of information before the accelerated trial date, we conclude that the law clearly mandated further limiting the scope of discovery so as to include only the non-privileged materials falling within the 11 categories of information designated by Plaintiffs in their letter of August 2nd (See "Appendix C") and to exclude those matters enumerated as irrelevant by Ford in "Exhibit 6" (See Appendix B). To the extent that a conflict may arise between matters designated in Appendices B and C, Appendix C shall take precedence over B.

Although Ford has shown itself entitled to the aforementioned relief from the originally charted scope of discovery, Ford itself will be bound by that newly defined scope. As a consequence, Ford will be prohibited from introducing into evidence any information that it did not produce to Plaintiffs as a result of the newly defined scope of discovery.

Thus, we conclude that although Respondent did not abuse his discretion in adopting the master's limitations scope, he did abuse his discretion in failing to further temper his Third Pretrial Order to fit the newly defined needs of the parties.

### 3. THE SIXTH PRETRIAL ORDER

Having determined that the trial court erred in failing to impose additional limitations on the scope of discovery as defined above, we hold that all rulings in the Sixth Pretrial Order requiring Ford to produce information falling outside the newly defined scope of discovery were the product of an abuse of discretion.

We additionally hold that the trial court's ruling under paragraph 8(a), to the extent that it requires production of "copies of any records relating to the denial, resolution or settlement of the claim including any documents of release given or obtained for or on behalf of the Defendant Ford Motor Company", and paragraph 8(b)(5) which requires production of "A copy of any documents reflecting the terms of any compromise, settlement or release obtained for or on behalf of Ford Motor Company", constitute a patent abuse of discretion in that the settlement information requested therein is neither relevant to the litigation nor reasonably calculated to lead to admissible evidence.

### V. Conclusion

Based upon the findings stated herein, we conditionally grant Relators' petition for mandamus relief. Respondent is hereby directed within 30 days herefrom to: (1) vacate his Third Pretrial Order to exclude Ford's privilege objections under request numbers 2, 14, and 24; (2) vacate his September 9th Order Approving First and Second Reports of Discovery Master to the extent that the order holds that Ford has waived its privileges as to request numbers 2, 14 and 24, (3) vacate his Sixth Pretrial Order in its entirety, and enter a new order which comports with the scope of discovery as defined herein.

**22.** See "Appendix C".

We are confident that the trial court will proceed accordingly, within 30 days; if it does not, the writ shall issue. Any additional relief requested by Ford is hereby denied.

APPENDIX A

IN THE DISTRICT COURT

RUSK COUNTY, TEXAS

4TH JUDICIAL DISTRICT

Susan Renae Miles, et al.

v.

Ford Motor Company, et al.

Cause No. 94–143

*SIXTH PRETRIAL ORDER*

On the 6th day of September, 1994 came on to be heard all pending motions of all parties and the parties appeared by and though their attorneys of record. The Plaintiffs announced ready for hearing on all motions but the Defendants, in connection with the Plaintiffs' Motion to Strike Exhibits and Testimony; to Compel, For Sanctions and Contempt, announced not ready and moved for a continuance or resetting of the motion. The Court found that this motion was originally set for pretrial hearing on Friday, September 2, 1994 and had been reset to this date in part to afford the Defendants sufficient notice of the proceedings consistent with a prompt hearing prior to a rapidly approaching trial setting. The Court, therefore, finds Defendants' further Motion for Continuance and/or Resetting to be without merit and the motion is hereby OVERRULED. The Court then proceeded to hear evidence on the Plaintiffs' Motion to Strike Exhibits and Testimony; to Compel, For Sanctions and Contempt and at the close of the evidence finds that the following order in connection with that motion should be entered:

The Plaintiffs' Motion to Strike and/or Exclude the Crash Test conducted on August 19, 1994 is DENIED. The Plaintiffs' Motion to Strike and/or Exclude Evidence or Testimony concerning the sled tests conducted on August 23, 1994 is GRANTED. It is ordered that no evidence concerning the sled tests shall be admitted during the trial of this case. It is further ORDERED that no mention of or reference to such tests, opinions or conclusions based in whole or in part upon such tests shall in any way be revealed or placed before the jury in any manner. Counsel for the Defendants are hereby ordered to instruct their witnesses accordingly.

The Court next considered a variety of pretrial motions relating to pending discovery issues. The parties agreed to submit such motions to the court for determination by subject matter. The court, having considered the evidence and arguments and authorities of counsel in regard to each of the subjects, finds that the following order should be and is hereby entered:

1. All documents required to be produced by the Defendants under this order shall be produced by delivering copies of the documents or tangible things to the offices of Plaintiffs' counsel in Dallas, Texas on or before Thursday, September 8, 1994 at 5:00 p.m. unless otherwise specified in this order.

2. Plaintiffs' Motion to Compel Production of Video Tape Recordings of Sled Test No. 5836, Run Nos. 8967–68, 8974–77, 8989, 8991, 8993, 8995–97, 9042, 9054–69, 9071, 9073, 9095–97, 9136–37, 9139, 9153, 9156–58, and 9161–63 is GRANTED. Defendants shall produce all such items.

3. Plaintiffs' Motion to Compel Production of Documents Concerning Communications by Ford, its agents, employees or representatives with government agencies, or representatives, including transcripts of conversations of Lee Iacocca, Henry Ford, II, and Richard M. Nixon, and any documents of contributions by Fords' officers or directors to the campaign of Richard M. Nixon or to the committee to Reelect the President during the period from 1970 through 1974 is also GRANTED. Defendants shall produce such documents.

4. Plaintiffs' Motion to Compel Production of Documents Relating to Sled Testing conducted by Ford in the cases of *Martinez, Green, Newman,* and *Greer,*

which cases have been identified by Defendants to Plaintiffs in prior document production is GRANTED. Production shall be made on or before 5:00 p.m., Monday, September 12, 1994 at the offices of Plaintiffs' counsel in Dallas, Texas.

5. Plaintiffs' Motion to Compel Production of Transcripts and Exhibits of the testimony of expert witnesses called by Ford in other litigation involving the subject matter of this law suit is GRANTED. Defendants shall make complete production at the offices of Plaintiffs' counsel in Dallas, Texas by 5:00 p.m. on September 12, 1994.

6. Plaintiffs' Motion to Compel Production of Certain Automotive Safety Office Documents is GRANTED. Defendants shall produce the Automotive Safety Office Documents identified by their index, "Attachment 4", which were not previously produced, by delivery to the offices of Plaintiffs' counsel in Dallas, Texas no later than 5:00 p.m., September 12, 1994. Plaintiffs shall advise Defendants of the documents from this index which they have determined were not previously produced.

7. Plaintiffs' Motion to Designate Leon Robertson as an Expert or Rebuttal Witness or, Alternatively for Sanctions is DENIED.

8. Plaintiffs' Motion for Contempt and to Compel Production of Documents relating to similar claims and law suits against the Defendant Ford is GRANTED. The Court finds that the Defendant Ford Motor Company has in its possession documents relating to previous or pending claims or litigation arising out of the design, manufacture, sale or marketing of lap and/or shoulder belts which include a product feature variously described as "tension eliminator", "comfort feature" or "window shade" features or devices. The Court finds that such documents are or may be relevant to the issues in this case or are reasonably calculated to lead to the discovery of relevant information. It is therefore ORDERED that the Defendant Ford Motor Company is in contempt of this Court's Third Pretrial Order. Ford shall forthwith purge itself of such contempt by delivery of the following documents to Plaintiffs' counsel in the form and manner previously described:

a. For each claim (not involving litigation) a copy of the claim or complaint, a copy of any response made by Ford to the complaint, and copies of any records relating to the denial, resolution or settlement of the claim including any documents of release given or obtained for or on behalf of the Defendant Ford Motor Company.

b. For all litigation:

1. A true and correct copy of the original and last amended pleading, complaint or petition by which any party seeks recovery from Ford by reason of such matter.

2. A copy of the last amended response, pleading or answer of Ford Motor Company.

3. A copy of the jury verdict if applicable.

4. A copy of the judgment of the court if applicable.

5. A copy of any documents reflecting the terms of any compromise, settlement or release obtained for or on behalf of Ford Motor Company.

9. Plaintiffs' Motion for Protective Order and the Defendants' Motion to Compel Production of Documents from the Plaintiffs in the particulars therein stated are respectively DENIED.

10. The Court finds that the first and second reports of Special Master, Senior District Judge Paul M. Colley, should be and are hereby APPROVED and ADOPTED and Objections thereto are OVERRULED. The Court will enter a separate order simultaneously herewith incorporating such findings.

11. Plaintiffs' Motion to Compel the Deposition of the witness R.E. Maugh and for relief in regard to production of witnesses by Ford is GRANTED. The De-

fendants are ordered to confer with Plaintiffs' counsel and to produce the witness R.E. Maugh with his complete file on this case at the offices of Plaintiffs' counsel in Dallas on a mutually agreed date during the period of September 12th through 16th, 1994. The Defendants are further ordered to confer with Plaintiffs' counsel and to produce any experts desired by Plaintiffs' counsel by agreement at a mutually convenient time. In the event the parties cannot agree upon a date within the existing scheduling order for Plaintiffs' deposition of expert witnesses, the Plaintiffs are hereby authorized and permitted to take such expert witnesses' deposition outside the time period specifically designated in the courts' Scheduling Order. If no agreement can be reached in regard to these depositions, further relief may be sought from the court by motion.

12. Defendants' Motion for Sanctions against the Plaintiffs is DENIED.

13. Plaintiffs' objections to the affidavit of the witness Gary L. Hayden, which was filed in this court on this date, are SUSTAINED. This affidavit is excluded from evidence for consideration by the court. The affidavit is, however, received for the purpose of a Bill of Exception as stated by the Defendants.

14. Plaintiffs' Motion to Compel Defendants to provide supplementation of Interrogatory No. 1, which required the Defendants to provide requested information for all persons with knowledge of relevant facts, is GRANTED. The Defendants shall provide full and complete responses to Interrogatory No. 1, including supplementation thereof in the form and manner previously described.

15. All other pending motions or claims for relief, however stated, not expressly granted herein are DENIED; provided, however, that the Court reserves further ruling upon the imposition of punishment for the Defendant's contempt and upon sanctions against the Defendants.

IT IS SO ORDERED.

SIGNED THIS 9th day of September, 1994.

/s/ DONALD R. ROSS
DONALD R. ROSS, Judge Presiding
4th Judicial District Court
Rusk County, Texas

APPENDIX B

*MILES v. FORD*

SAMPLES OF IRRELEVANT MATTERS COVERED BY PLAINTIFFS' DISCOVERY

## MILES v. FORD

### SAMPLES OF IRRELEVANT MATTERS
### COVERED BY PLAINTIFFS' DISCOVERY

| SUBSTANCE OF REQUEST | IRRELEVANT MATTERS COVERED |
|---|---|
| | unintended acceleration |
| | failure of parking brake to hold . |
| | tests regarding handling/stability of light trucks in rollover accidents |
| | effect of oversize tires on vehicle stability |
| | occupants riding in cargo bed of pickup |
| | carrying more passengers than designated seating positions in vans/pickup trucks |
| | analysis of side impact accidents involving pickup trucks |
| | incorrect tire pressure |
| INTERROGATORY NO. 5 | improper tire maintenance |
| "any and all analyses, . . . studies, | driving at excessive speed |
| tests . . . which relate to or reflect any and all hazards likely to be associated | inadequate maintenance of brakes |
| with the use of light trucks" | overloading of cargo |
| | improper positioning of cargo |
| | improper securing of cargo |
| | improper maintenance of headlamps |
| | use of improper bumper hitches |
| | improper towing |
| | flammability of floor covering |
| | improper latching of liftgate |

| | |
|---|---|
| **REQUEST NO. 2**<br><br>"[A]ll documentation . . . referencing any and all crash testing . . . in which there is a frontal impact." | documents concerning door openability following a frontal crash |
| | fuel system integrity testing |
| | testing of the front bumper |
| | windshield-retention testing |
| | energy-absorbing steering column testing |
| | documents reporting movement of unbelted dummies in frontal impacts |
| | documents recording extent of front structure crush in front crash of 1975 Ford car |
| | instrumentation set up sheets |
| **REQUEST NO. 16**<br><br>"All documents . . . referencing or relevant to any proposal . . . with regard to the possible redesign or modification of any occupant restraint system [or] any vehicle seat to prevent or reduce any failure of the seat in a frontal impact." | would include any potential redesign of vehicle seat in any Ford product ever (other than components at issue) |
| | would include any potential redesign of active safety belt since the late 1950's (other than components at issue) |
| | evaluations of integrated safety belt systems |
| | change rear lap to lap-and-shoulder belts |
| | changes in composition of belt webbing |
| | change front lap belt to lap-and-shoulder belts |
| | relocation of anchorage bolts for rear belts |
| | incorporation of ignition interlock in 1974 |
| | elimination of ignition interlock in 1975 |
| | incorporation of passive safety belts |
| | changes in removable rear seats in vans |
| | changes in side-facing rear seats in supercabs |
| | changes in rear-facing seats in station wagons |
| **REQUEST NO. 17**<br><br>"All documents . . . relevant to any consideration of the cost or expense of redesigning . . . any . . . occupant restraint system [or] any vehicle-seat to prevent or reduce any failure of the seat in a frontal impact." | cost of passive belt motorized track |
| | cost of adding extra length to belt webbing |
| | cost associated with ignition interlock |
| | costs of rear seat lap-and-shoulder belts |
| | cost of strengthening floorpan to support removable rear seats in vans |

| SUBSTANCE OF REQUEST | IRRELEVANT MATTERS COVERED |
|---|---|
| **REQUEST NO. 18**<br><br>"All documents . . . relevant to the field use and/or accident experience of: (1) light trucks; (2) occupant restraint systems, and/or (3) vehicle seats in frontal impacts." | all claim and lawsuit information involving light trucks regardless of model year and regardless of alleged defect |
| | all warranty information involving light trucks regardless of model year |
| | injuries to unrestrained occupants riding in bed of pickup trucks |
| | allegations that pedestal type seat functioned in frontal collision |
| | front collision performance of light truck bumpers in 5 mph impacts |
| | front collision performance of light truck steering columns and steering wheels |
| | front collision performance of light truck fuel lines and other fuel system components |
| | front collision performance of light truck instrument panels and dashboards |
| | front collision performance of light truck windows and side glass |
| | front collision performance of rear seat lap belts |
| | front collision performance of rear seat lap-and-shoulder belts |
| | front collision performance of passive shoulder belts in any passenger car |
| | police reports regarding light truck frontal impacts involving unbelted drivers |
| | news articles reporting frontal collision of a Ford vehicle in which belt webbing allegedly broke |
| | TV videotapes showing scene of light truck frontal collision involving ejection of unbelted rear seat occupant |
| | medical records pertaining to broken toe incurred in a light truck frontal collision |
| | plaintiffs' expert testimony alleging front collision failure of van's removable rear seats |

## APPENDIX C

WELLBORN, HOUSTON, ADKISON, MANN, SADLER & HILL

ATTORNEYS AT LAW

P.O. BOX 1109—300 W. MAIN ST.

HENDERSON, TEXAS 75653–1109

J. MARK MANN

Board Certified—Personal Injury Trial Law

Texas Board of Legal Specialization

Board Certified Civil Trial Specialist—National Board of Trial Advocacy

August 2, 1994

Mr. Richard Grainger

Grainger, Howard, Davis & Ace

P.O. Box 491

Tyler, TX 75710

RE: Cause No. 94–143

Susan Miles, et al v. Ford Motor Company, et al

Dear Dick:

In response to your August 1 letter, I have agreed to put off the hearing assuming that the contents in this letter will be satisfactory in honing in your clients on documents that are particularly important in our discovery dispute. I would think that this letter will satisfy your company of our attempt to narrow the scope of discovery to the particularly relevant documents. Of course, just like any other litigation, your client will have to make a decision based on common sense as to what matters are relevant to this litigation. Certainly, our detailed expert reports will help in making those decisions in a good faith manner.

I would hope that when you discussed with Judge Colley putting off any opinions or recommendations that it did not include his decision making in the "privilege" area. It is my assumption that Judge Colley is making a final decision on the privileged documents. At any rate, the following is a list of categories of documents which we would like to see based on our discovery requests:

1. Documents related to TE, its development, elimination, modifications or alternatives. This includes devices that accomplish the same purpose but are called by different names;

2. Pre-tensioners or webb locks, or similar devices, the purpose of which is to ensure there is no slack in a belt or to reduce the amount of slack in a belt.

3. Documents related to the amount of slack found in belts and/or its effect.

4. Documents related to cervical spine, head or upper torso injury of or related to belt use.

5. Occupant kinematics in frontal collisions, including computer simulations or other data or testing.

6. Governmental restrictions, regulations or requirements regarding tension eliminator or other slack-inducing devices for the United States and other governments (would include Europe, Australia, Canada and other foreign countries).

7. Crash tests, simulations, computer or otherwise and similar materials concerning TE.

8. Other communications with government, *not just communications with NTHSA* related to restraints (excluding those related solely to air bags), such as the transcripts of visits by Ford and Iaccoa with Nixon in which safety standards were discussed, and records of any connected or simultaneous contributions to the Committee to Re-elect the President.

9. Documents related to the comparison of costs regarding the development and use of belts with or without TE or similar features.

10. The effect of TE in angular collisions (in other words, to frontal left and right impacts).

11. The combined problems of TE and seat back give-away or seat back collapse.

Certainly, this should prevent the production of "windshields in Brazil."

As we discussed with Gary Hayden, we would expect these documents to come in as soon as possible if they have not already been produced and would obviously want these documents before we start taking your expert's depositions.

Thank you for your attention.

Yours very truly,

/s/ J. Mark Mann
J. MARK MANN
For the Firm

JMM/ki

cc: Honorable Paul S. Colley